655 F.2d 41
 O.S.H. Cas.(BNA) 2075, 1981 O.S.H.D. (CCH) P 25,575
PULLMAN POWER PRODUCTS, INC., Petitioner,
v.
Ray MARSHALL, Secretary of Labor; Occupational Safety and
Health Review Commission, Respondents.
 No. 80-1653.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1981.
Decided July 27, 1981.
 
 Ann S. Pepperman, Williamsport, Pa. (McNerney, Page, Vanderlin & Hall, John Alogna, Williamsport, Pa., Pullman Power Products, Inc. on brief), for petitioner.
 John R. Bradley, U. S. Dept. of Labor, Washington, D. C. (Marshall H. Harris, Regional Sol., Philadelphia, Pa., Alfred G. Albert, Acting Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Counsel, for Appellate Litigation, Charles I. Hadden, Asst. Counsel, for Appellate Litigation, Washington, D. C., on brief), for respondents.
 Before FIELD, Senior Circuit Judge, and SPROUSE and ERVIN, Circuit Judges.
 ERVIN, Circuit Judge:
 
 
 1
 Pullman Power Products, Inc. (Pullman) seeks review of an order of the Occupational Safety and Health Review Commission (the Commission) affirming citations for workplace safety violations issued against Pullman by the Secretary of Labor. We affirm.
 
 I.
 
 2
 In 1978 Pullman was one of seventeen subcontractors engaged in the construction of a nuclear power plant for Appalachian Power Company (Apco) in New Haven, West Virginia. The site was divided into numerous work areas, including the cooling towers and power house. In response to an employee complaint, safety compliance officer Jerry Good visited the power house site for the Secretary of Labor[1] to conduct an inspection. Good met with Apco's safety supervisor, Combs, and then conducted an opening conference with representatives of the subcontractors, including Pullman, during which Good presented his credentials and explained the scope and purpose of the inspection. Good's inspection was completed on April 27, at which time he conducted a closing conference with Pullman's construction superintendent, Springer. No citations were issued in connection with the power house inspection.
 
 
 3
 Good returned to the Apco site on June 13 and June 22, 1978; at that time he conducted an opening conference with contractors involved in the cooling tower site. Pullman, whose work was confined to the power house, was not included in this conference. During the cooling tower inspection, Good received a verbal complaint from an employee of Union Boiler Company, another contractor at the power house site, concerning an unguarded catwalk in the power house. Because the cooling tower inspection had a higher priority, Good completed that inspection before investigating the verbal complaint. On July 7, 1978, after finishing the cooling tower inspection, Good went to Union Boiler's office, presented his credentials to the company's superintendent and informed him of the complaint. The superintendent designated Apco supervisor Combs as his representative during the ensuing inspection and also named an employee representative. At the power house site, Good observed an employee on an unguarded catwalk approximately fifty to sixty feet above the next level, with other employees nearby, and he also observed a wire rope lying across the catwalk.[2] These workers were identified as Pullman employees, and they further identified Russell Parrish, working at a desk on the next level, as their foreman.[3]
 
 
 4
 At the administrative hearing, Good testified that he presented his credentials to Parrish, informed him that Pullman employees were exposed to the hazards of falling and tripping, advised him that the hazards should be abated and requested that the information be passed on to Parrish's superintendent at the site. Combs testified that during the inspection he was wearing a white hard hat with his name on it and that Good was wearing a white hard hat with an OSHA insignia on it. He stated that he had observed Good talking to Parrish but that he was unable to hear what was said. Parrish testified that, although he was approached by two or three men wearing white hats, he did not recall being shown any credentials or being told about an inspection. According to Parrish, he was not told of the hazardous conditions or of the need to correct them.
 
 
 5
 On July 20, 1978, while preparing his report of the inspection, Good called Pullman superintendent Springer to insure that he knew of the hazardous conditions. Good testified that he did this as a courtesy. He informed Springer that these conditions should be added to any violations discussed in the closing conference for the April inspection and that Pullman's rights and responsibilities were the same as then.
 
 
 6
 In September 1978, the Secretary issued Pullman two citations for safety violations, one serious and one nonserious, under 29 U.S.C. § 666(j) and (c) and 29 C.F.R. § 1926.500(d)(2) and .25(a). The Secretary proposed a $560 penalty for the serious violation and a $0 penalty for the nonserious violation and ordered immediate abatement.[4]
 
 
 7
 Pullman timely contested the citations and the proposed penalties. During a May 1979 administrative hearing, Pullman stipulated that the violations existed as alleged but argued that the Secretary had failed to comply with established inspection procedures. The company specifically averred that Good had failed (1) to present his credentials or to identify himself to the employer's agent in charge; (2) to conduct an opening conference; (3) to provide employer or employee representatives walkaround rights, that is, the opportunity to accompany Good during the inspection; and (4) to conduct a closing conference. These omissions, Pullman contended, constituted violations of the Act and the Secretary's regulations[5] and therefore voided the citations and resulting penalties. The Secretary contended that the procedural requirements of the Act had been substantially complied with, but that, in any event, Pullman had shown no prejudice in the preparation or presentation of its defense on the merits from the Secretary's failure to comply strictly with those requirements.[6]
 
 
 8
 The Administrative Law Judge (ALJ) found the existence of the violations but vacated the citations because he concluded that there had been no inspection within the meaning of the Act. Pursuant to 29 U.S.C. § 661(i), the Secretary successfully petitioned for review by the full Occupational Safety and Health Review Commission, which reversed the decision of its ALJ, reinstated the citations and imposed a $560 penalty. The Commission concluded that, because Good was at the worksite with the permission of a representative of the owner of the project, he had complied with the provisions of section 8(a) of the Act. The Commission further concluded that, in any event, failure by Good to comply with section 8(a) or (e) would not operate to exclude evidence or to vacate the citations because Pullman did not claim that noncompliance had caused prejudice in the preparation of its defense.
 
 II.
 
 9
 On appeal, we need not address the question whether the Secretary substantially complied with established inspection procedures because we agree with the Commission that Pullman's inability to show prejudice bars its attack on the validity of the citations. This decision to impose a prejudice requirement finds us in accord with every circuit that has considered the issue, see Marshall v. C. F. & I. Steel Corp., 576 F.2d 809, 813-14 (10th Cir. 1978); Marshall v. Western Waterproofing Co., Inc., 560 F.2d 947, 952 (8th Cir. 1977); Hoffman Construction Co. v. OSHRC, 546 F.2d 281, 282-83 (9th Cir. 1976); Hartwell Excavating Co. v. Dunlop, 537 F.2d 1071, 1073 (9th Cir. 1976); Chicago Bridge & Iron Co. v. OSHRC, 535 F.2d 371, 377 (7th Cir. 1976); Accu-Namics, Inc. v. OSHRC, 515 F.2d 828, 833 (5th Cir. 1975), cert. denied, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976), and comports with the statutory purpose of "assur(ing) so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). An employer that cannot show it was harmed in any way by the Secretary's procedural violations should not be allowed to insulate itself from liability as a result thereof. The Commission's order is affirmed.
 
 
 10
 AFFIRMED.
 
 
 
 [1]
 The Secretary is authorized by the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651, et seq. (the Act), to set occupational safety and health standards for businesses affecting interstate commerce
 
 
 [2]
 The existence of the safety violations is not in dispute. Pullman stipulated that its employees were using an unguarded catwalk and that there was a wire rope lying across it
 
 
 [3]
 Parrish was actually a Pullman craft employee serving as acting foreman during the temporary absence of the regular foreman
 
 
 [4]
 At the time of the July 20 telephone call, Springer advised Good that Pullman had already abated the violations and that there had been no injuries
 
 
 [5]
 The statutory and regulatory framework for these allegations is as follows:
 
 
 [1]
 Credentials/identification
 Section 8(a) of the Act provides:
 In order to carry out the purpose of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized
 (1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and
 (2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent or employee.
 29 U.S.C. § 657(a) (emphasis added).
 See also 29 C.F.R. § 1903.7(a) (1979).
 
 
 [2]
 Opening conference
 No provision in the Act requires an opening conference with the employer, but the Secretary has issued the following regulation with respect to the conduct of inspections:
 At the beginning of an inspection, Compliance Safety and Health Officers shall present their credentials to the owner, operator, or agent in charge at the establishment; explain the nature and purpose of the inspection; and indicate generally the scope of the inspection and the records ... they wish to review.
 
 
 [29]
 C.F.R. § 1903.7(a) (1979) (in pertinent part)
 
 
 [3]
 Walkaround rights
 Section 8(e) of the Act makes this provision for walkaround rights:
 Subject to regulations issued by the Secretary, a representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace under subsection (a) of this section for the purpose of aiding such inspection. Where there is no authorized employee representative, the Secretary or his authorized representative shall consult with a reasonable number of employees concerning matters of health and safety in the workplace.
 29 U.S.C. § 657(e).
 The regulation issued pursuant to section 8(e) is 29 C.F.R. § 1903.8(a) which provides in pertinent part:
 Compliance Safety and Health Officers shall be in charge of inspections and questioning of persons. A representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Compliance Safety and Health Officer during the physical inspection of any workplace for the purpose of aiding such inspection.
 
 
 [4]
 Closing conference
 As with the opening conference, there is no provision in the Act for a closing conference. One of the Secretary's regulations, however, provides that
 (a)t the conclusion of an inspection, the Compliance Safety and Health Officer shall confer with the employer or his representative and informally advise him of any apparent safety or health violations disclosed by the inspection. During such conference, the employer shall be afforded an opportunity to bring to the attention of the Compliance Safety and Health Officer any pertinent information regarding conditions in the workplace.
 
 
 [29]
 C.F.R. § 1903.7(e) (1979)
 
 
 [6]
 Pullman has at no time claimed that it has been in any way prejudiced